UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Known Litigation Holdings, LLC,<br>    *Plaintiff*,<br>        *v.*<br>Navigators Ins. Co., Navigators Management (UK) LTD, and Certain Interested Underwriters of Lloyd's of London,<br>    *Defendants*. | Civil No. 3:12cv269 (JBA)<br><br>March 20, 2013 |

RULING ON DEFENDANTS' MOTION TO DISMISS

In this action, Plaintiff Known Litigation Holdings, LLC, the successor assignee of Domestic Bank, seeks to recover insurance proceeds from Defendants Navigators Insurance Company, Navigators Management Ltd., and certain interested underwriters of Lloyd's of London (collectively "Defendants" or "Navigators"), in its capacity as loss payee under several insurance policies Defendants issued to New England Cash Dispensing ("NECD") and its affiliate, Integrated Merchant Systems ("IMS"). Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7), Defendants now move [Doc. # 25] to dismiss Plaintiff's Amended Complaint [Doc. # 24] in its entirety. Defendants argue (1) that Plaintiff lacks standing because it is not a named insured under the Courier Risks Policy, (2) that Plaintiff's claims are time–barred by the suit limitation clause in the Courier Risks Policy, (3) that Plaintiff has failed to join NECD and IMS, who are necessary parties to the suit, (4) that Plaintiff's estoppel claims should be dismissed because Connecticut does not recognize an affirmative cause of action for equitable or promissory estoppel, and (5) that Plaintiff fails to state a claim for which relief can be granted.  For the following reason, Defendants' motion is denied.

I.      Factual Background

    A.      The NECD Agreement

Plaintiff is the successor assignee of certain claims of Domestic Bank arising out of Domestic Bank's status as a loss payee on several insurance policies underwritten by Defendants. (*See* Am. Compl. [Doc. # 24] ¶ 1.) Beginning in March 2000, Domestic Bank entered into an agreement with NECD (the "NECD Agreement"), pursuant to which NECD was responsible for servicing Domestic Bank's ATMs. (*See id.* ¶¶ 17–18; NECD Agreement, Ex. A to Am. Compl.). On May 12, 2006, Domestic Bank entered into a second agreement with NECD and IMS (the "Courier Agreement), pursuant to which NECD and IMS were responsible for transferring cash owned by Domestic Bank (the "Bank Cash") to and from Domestic Bank's ATMs. (*See* Am. Compl. ¶¶ 19–20; Courier Agreement, Ex. B to *id.*) Under the terms of the Courier Agreement, NECD and IMS were responsible for loss to Domestic Bank resulting from any malfeasance on the part of NECD's or IMS's employees:

> Except in respect to shortages of Bank's currency which are determined to be the result of ATM hardware or software malfunction, Couriers shall be responsible for any shortage or loss of Bank's currency, resulting from embezzlement or theft by any third party or employee or agent of Couriers, from any act of God or insured peril, from any terrorist act, from any mysterious unexplained disappearance or from any other cause, whether known or unknown; and Couriers shall reimburse Bank for any such shortage or loss. Such reimbursement shall be made forthwith upon notice by Bank to Couriers of any such shortage or loss.

(Courier Agreement ¶ 3.) Thus, as a part of the Courier Agreement, NECD and IMS were required to maintain insurance for the services they provided to Domestic Bank:

> At all times while Couriers are providing services to Bank as herein set forth, Couriers shall maintain insurance with coverage in amounts and with deductibles as are set forth in the schedule of insurance which is Exhibit A attached hereto and made a part hereof or with such other carriers, with such higher amounts of coverage and/or such other deductibles as Bank may require from time to time hereafter. In all such insurance, Bank will be named as loss payee. Each insurance policy shall

2

> require not less than 30 days advance notice to Bank of cancellation of the policy and, if available to Couriers, with not less than 30 days advance notice of non–renewal of such policy. The term non–renewal shall include non–renewal by Couriers as well as by the insurance carrier. The insurance carrier or Couriers' agent shall provide to Bank each year a certificate evidencing the existence of such insurance forthwith upon renewal thereof.

(*Id.* ¶ 2; *see also* Am. Compl. ¶¶ 21–24.)

      B.      The Courier Risks Policy

In February 2006, NECD purchased an insurance policy underwritten by Defendants, insuring NECD for certain courier risks (the "Courier Risks Policy"). (*See* Am. Compl. ¶¶ 26–29; Courier Risks Policy, Ex. C to Am. Compl.) This policy included coverage for the embezzlement of funds by NECD employees:

> Notwithstanding any thing [sic] herein contained to the contrary, it is noted and agreed that: The Insured property is also covered against loss caused by dishonesty and/or embezzlement committed by any employees of the Assured provided that such losses are discovered within 30 (thirty) days of their occurrence . . .

(Courier Risks Policy; *see also* Am. Compl. ¶ 29.) In April 2006, a Loss Payment Rider was added to the Courier Risks Policy, which identified Domestic Bank as a potential designated loss payee:

> In the event that the insured is entitled to any payment under this policy, it is agreed that the insured may designate, in writing, a customer to whom the payment or any part thereof shall be made. It is further understood and agreed that insured's designee has no rights under the contract of insurance. The only right conferred is the right to receive direct payment in accordance with this rider but in no event shall payments made under this policy exceed the applicable coverage limit.

(Loss Payment Rider, Ex. D to Am. Compl.; *see also* Am. Compl. ¶ 30.) A Cancellation Clause was also added, stating: "It is understood and agreed that this policy may be cancelled by either side subject to 30 days['] notice in writing to Domestic Bank."

3

(Cancellation Clause, Ex. E to Am. Compl.; *see also* Am. Compl. ¶ 31.)  In July 2006, an Armored Car Cargo Liability Policy endorsement was also included as a part of the Courier Risks Policy.  (*See* Armored Car Cargo Liability Policy, Ex. F to Am. Compl.; *see also* Am. Compl. ¶¶ 32–34.)

On September 26, 2006, Domestic Bank contacted the overseas broker for Defendants requesting additional clarification regarding NECD's coverage under the Courier Liability Policy.  (*See* Am. Compl. ¶ 35–37; Ex. G to *id.*)  Specifically, Domestic Bank inquired as to the nature of the coverage for losses arising from employee malfeasance:

> The policy specifically states that there is coverage for acts or omissions of the insured or any of its employees.  Thus, I would assume that there is coverage under this policy for theft of Domestic Bank's money by an employee of NEC[D] and the condition of 30 days' notice is not applicable in this policy.

(Ex. G. to Am. Compl.; *see also* Am. Compl. ¶ 35.)  On October 9, 2006, Defendants' agent replied that Domestic Bank's understanding was "basically . . . correct" but that further clarification and simplification was needed.  (*See* Am. Compl. ¶¶ 37–39; Ex. H to *id.*)  In light of the response that further clarification was needed, Domestic Bank requested a response to its outstanding questions, but no further communication regarding Domestic Bank's interpretation of the policy was received.  (*See* Am. Compl. ¶ 40; Ex. G to Am. Compl.)  NECD renewed the Courier Risks Policy every year from 2006 to 2010, and continued to name Domestic Bank as the only designated customer in the Loss Payment Rider.  (*See* Am. Compl. ¶ 41; Exs. J, K, L, and M to *id.*)

    C.    The Bank Loss

On February 9, 2010, Domestic Bank became aware that the government was investigating the alleged theft and conversion of Bank Cash from the ATMs serviced by

4

NECD and IMS. (*See* Am. Compl. ¶ 42.) Domestic Bank demanded an accounting of Bank Cash from NECD in light of this investigation, but on February 23, 2010, the CEO of NECD and IMS, Joseph Sarlo, confessed to Domestic Bank that a proper accounting could not be supplied, and that he was aware of a shortage of Bank Cash totaling at least $1 million. (*See id.* ¶ 43.) Prior to this confession, neither NECD nor IMS had disclosed any potential shortage of Bank Cash, and Domestic Bank had no reason to suspect that any of its funds were unaccounted for. (*See id.* ¶ 44.) Upon this revelation, Domestic Bank conducted its own investigation and audit of the ATMs serviced by NECD and determined that there was a shortage of Bank Cash in excess of $5 million. (*See id.* ¶ 46.) This shortage resulted from a scheme to defraud Domestic Bank perpetrated by the employees of NECD and IMS between 2006 and 2010. (*See id.* ¶ 47.)

On March 31, 2010, Domestic Bank made written demand on NECD and IMS for immediate reimbursement of the missing Bank Cash, but Domestic Bank has yet to receive any compensation for its loss resulting from this scheme. (*See id.* ¶¶ 47–48.) A copy of this demand was forwarded to Defendants, and was the first notice Defendants received of the loss. (*See id.* ¶ 49.) On August 31, 2010, Defendants issued a Reservation of Rights letter regarding Domestic Bank's claim against the Courier Risks Policy (*see id.* ¶ 40; Ex. O to *id.*), and on November 29, 2010, Defendants rescinded the Courier Risks Policy *ab initio* as a result of misstatements made by NECD in procuring the policy (*see id.* ¶ 51; Ex. P to *id.*). To date, neither Domestic Bank nor Plaintiff has received any payment pursuant to the policies, nor has the refund of any premiums been made to Domestic Bank or Plaintiff. (*See* Am. Compl. ¶ 52.)

II.     Legal Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory allegations are not sufficient. *Id.* at 678–79.

Pursuant to Federal Rule of Civil Procedure 12(b)(7) a court may also dismiss a complaint for failure to join a required party under Federal Rule of Civil Procedure 19. Rule 19 governs joinder of persons needed for just adjudication:

> A person who is subject to service of process and whose joinder will not deprive the court of subject–matter jurisdiction must be joined as a party if in that person's absence, the court cannot accord complete relief among existing parties; or that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may as a practical matter impair or impede the person's ability to protect the interest; or leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). In reviewing a motion to dismiss pursuant to Rule 19, the Court determines whether an absent party is "necessary" under Rule 19(a) as a threshold requirement before undertaking a Rule 19(b) analysis as to whether the party is also "indispensable" such that dismissal would be required in its absence. "A party cannot be indispensable unless it is a 'necessary party' under Rule 19(a)." *Jonesfilm v. Lion Gate Int'l*, 299 F.3d 134, 139 (2d Cir. 2002).

6

III.   Discussion

Defendants claim the following grounds in support of their motion to dismiss: (1) Plaintiff lacks standing because it is not a named insured under the Courier Risks Policy, (2) Plaintiff's claims are time–barred by the suit limitation clause in the Courier Risks Policy, (3) Plaintiff has failed to join NECD and IMS, who are necessary parties to the suit, (4) Plaintiff's estoppel claims should be dismissed because Connecticut does not recognize an affirmative cause of action for equitable or promissory estoppel, and (5) Plaintiff fails to state a claim for which relief can be granted.[1]

A.   Choice of Law

The parties agree that pursuant to the choice–of–law provision in the Courier Risks Policy (*see* Ex. B to Am. Compl.), this dispute is governed by Connecticut law. Therefore, the Court will apply Connecticut law to the instant dispute. Under Connecticut law, "[a]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." *Connecticut Medical Ins. Co. v. Kulikowski*, 286 Conn. 1, 5 (2008) (internal quotations and citations omitted). "In accordance with those principles, the determinative question is the intent of the parties, that is, what coverage the insured expected to receive and what the insurer was to provide as disclosed by the provisions of the policy." *Id.* (internal quotations and citations omitted). "When interpreting an insurance policy, [courts] must look at the contract as a

---

[1] In deciding the instant motion, the Court will consider the documents attached as exhibits 1 and 2 to Defendant's memorandum [Doc. # 26] of law in support of its motion to dismiss. *See Int'l Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1992) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding into one for summary judgment.").

7

whole, consider all relevant portions together, and if possible, give operative effect to every provision in order to reach a reasonable overall result." *Id.* at 6 (internal quotations and citations omitted). "If the terms of the policy are clear and ambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." *Id.* at 5 (internal quotations and citations omitted). However, if a provision is ambiguous in that "it is reasonably susceptible to more than one reading . . . any ambiguity . . . must be construed in favor of the insured because the insurance company drafted the policy." *Id.* at 6 (internal quotations and citations omitted).

B.    Standing

Defendants argue that because Plaintiff is only a loss payee, and not an insured,[2] it does not have standing to sue under the Courier Risks Policy. Plaintiff counters, however, that under the terms of the Loss Payee Rider, it is an intended third–party beneficiary of the policy, and thus has standing to sue.

Defendant relies on two District of New Jersey cases, *Carteret Ventures, LLC v. Liberty Mutual Ins. Co.*, No. 09-2831 (JLL), 2009 WL 3230844 (D.N.J. Oct. 2, 2009), and *In re Tri–State Armored Serv.'s, Inc.*, 366 B.R. 326 (D.N.J. 2004), for the proposition that a loss payee on a fidelity bond lacks standing to pursue a claim directly against an insurer. In *Tri–State*, customers of Tri–State, an armored car company, filed breach of contract claims against Tri–State's insurer pursuant to a fidelity insurance policy issued by the insurer on which the customers had been listed as loss payees. The district court, citing

---

[2] Plaintiff does not argue that Domestic Bank's status as a loss payee under the Courier Risks Policy rendered it an additional insured under the policy, and agrees that under Connecticut law its rights as a loss payee's "[a]re no better than those acquired under the policy by [the insured]." *See Pavano v. Western Nat'l Ins. Co.*, 139 Conn. 645, 649 (1953).

8

New Jersey law, found that the loss payees did not have a direct right of action against the insurer under the policy, because the policy clearly stated that it "provide[d] no rights or benefits to any other person or organization," other than the named insured, Tri–State. *Tri–State*, 336 B.R. at 335, 345.

Similarly, in *Carteret*, the plaintiff sued an insurer directly under a fidelity insurance policy in its capacity as loss payee. The loss payee rider at issue in that case stated: "This insurance is for [the insured's] benefit only. It provides no right or benefits to any other person or organization including the Loss Payee, other than payment of loss as set forth in this endorsement." *Carteret*, 2009 WL 3230844, at *2. The policy also provided that "[a]ny claim of loss that is covered under this insurance must be presented by [the insured]." *Id.* The district court concluded, under New Jersey law, that according to the clear and unambiguous terms of the policy, Carteret did not have any rights under the policy as loss payee, and was not entitled to payment until the insured submitted a claim under the policy. *See id.* at *4. Thus, Carteret had no standing to sue until the insured triggered a loss under the policy by submitting its claim. Because the Courier Risks Policy contains similar language in its Loss Payment Rider (*see* Ex. C to Am. Compl.), Defendants urge this Court to follow the reasoning of the *Tri–State* and *Carteret* courts and conclude that Plaintiff lacks standing to bring this action. However, these cases are based on the application of New Jersey law, and thus are not controlling authority.

Plaintiff counters with several Connecticut cases that have concluded that loss payees do have standing to sue insurers directly for breach of an insurance policy. In *Pavano v. Western Nat'l Ins. Co.*, 139 Conn. 645 (1953), the Connecticut Supreme Court held that a loss payee had standing to bring a direct suit against the insurer under a fire

9

insurance policy. *See id.* at 648–49. In that case, the plaintiff had mortgaged kitchen equipment to an individual who named the plaintiff as a mortagee and loss payee in the fire insurance policy he purchased to insure the equipment. The court determined that because the loss was payable to the plaintiff under the mortgage loss payable clause, the parties had intended to make the plaintiff a third–party beneficiary of the contract. *See id.* Similarly, in *Vernon Foodliner, Inc. v. Cent. Mut. Ins. Co.*, 1 Conn. App. 595 (1984), the Connecticut appellate court found that where because intervening plaintiff had been named as a loss payee under a standard mortgage loss payable clause, the parties to the policy had intended that the defendant would owe a direct obligation to the intervening plaintiff, and thus the intervening plaintiff was a third–party beneficiary of the contract with standing to sue the defendant directly. *See id.* at 601–02. Thus, under Connecticut law, where a plaintiff is named as a loss payee under an insurance policy, the parties to the policy may have intended for the plaintiff to be a third–party beneficiary with standing to sue. *See Litton Loan Servicing, LP v. New London County Mut. Ins. Co.*, No. CV076000494, 2011 WL 803030, at *3 (Conn. Super. Ct. Feb. 1, 2011) ("It is clear from the intention of the parties in the present action, as evidenced by the existence of the loss payable clause, that the defendant was meant to owe a direct obligation to the plaintiff under the policy. The plaintiff therefore has a right to sue the defendant directly on the contract." (internal citations omitted)); *Family Leasing & Finance Inc. v. Infinity Ins. Co.*, No. CV970060951S, 2000 WL 1658377, at *2 n.3 (Conn. Super. Ct. Oct. 3, 2000) ("Because the loss payable clause lists the plaintiff as the loss payee, the court finds that it was the intent of the contracting parties that the plaintiff be a third–party beneficiary of the insurance policy.").

Defendants attempt to distinguish these cases as involving liability insurance policies rather than fidelity insurance policies, where some of the parties were secured creditors under mortgage loss payable clauses, and thus actually constituted named insureds under the terms of those clauses.[3] Neither party points to any Connecticut case law determining whether a loss payee under a fidelity insurance policy had standing to bring a breach of contract suit directly against the insurer, and Defendants offer no authority to support their view that the outcome of the third–party beneficiary test depends on the type of insurance policy being interpreted.[4] Absent any clear bar to standing as a third–party beneficiary under the policy due to the nature of the policy as a fidelity bond, the Court will look to the terms of the Courier Risks Policy to determine whether Plaintiff was an intended third–party beneficiary, in which case, it would have standing to maintain the present suit.

Under Connecticut law, "the ultimate test to be applied in determining whether a person has a right of action as a third party beneficiary is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party beneficiary." *Grigerik v. Sharpe*, 247 Conn. 293, 311–12 (1998) (internal quotations and emphasis omitted). "[The parties'] intent is to be determined from the terms of the

---

[3] In *Vernon*, the court also held that the intervening plaintiff, as a secured creditor of Vernon Foodliner, was a named insured pursuant to the terms of the mortgage loss payable clause. *See* 1 Conn. App. at 597. While Plaintiff was not a mortagee in the case at bar, the property covered under the Courier Risks Policy belonged to Domestic Bank, rather than to NECD or IMS, and thus Plaintiff's status is arguably more similar to the cases cited by Plaintiff than Defendants recognize.

[4] One other state court, the Georgia Court of Appeals, has determined that loss payees may be third–party beneficiaries under a fidelity contract. *See Phoenix Ins. Co. v. Aetna Cas. & Surety Co.*, 169 S.E.2d 645, 649 (1969) (holding that the plaintiff, as a loss payee under a fidelity insurance policy, had standing to sue the insurer directly).

contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." *Id.* at 312 (internal quotations and emphasis omitted). Under the terms of the Loss Payment Rider, a loss payee has "the right to receive direct payment in accordance with this rider," and NECD identified Domestic Bank as a potential designated loss payee under the rider. (Ex. D to Am. Compl.) Thus, by the unambiguous terms of the rider, Defendants and NECD intended to create a direct obligation from Defendants to Plaintiff. Defendants argue that because the loss payee rider states that "that insured's designee has no rights under the contract of insurance," (*id.*) the parties to the policy cannot have intended for Plaintiff to be a beneficiary under the policy. However, this language is not relevant to the third–party beneficiary inquiry under Connecticut law, because as the Connecticut Supreme Court has recognized, "the intent to confer a benefit is irrelevant to the determination of whether the plaintiff was a third party beneficiary, rather the appropriate inquiry is whether the parties intended to create a direct obligation from one party to a third party." *Grigerik*, 247 Conn. at 313. Because the terms of the Loss Payment Rider clearly state that a designated loss payee has a right to direct payment from Defendants, the Court concludes that Plaintiff has pled sufficient facts to allege that it was a third–party beneficiary of the Courier Risks Policy, and has standing to pursue this suit directly against Defendants.

C. Timeliness

Defendants also argue that Plaintiff failed to comply with the suit–limitation provision in the Courier Risks Policy, and that this action is therefore time–barred. Regarding the time limit for bringing suit for recovery of loss, the policy provides as follows:

> The insured, upon knowledge of any loss, shall give immediate notice thereof to the police or other peace authorities having jurisdiction and

> shall as soon as practicable report to Insurers every loss or damage which may become a claim under this policy, and shall file with Insurers without delay a detailed sworn proof of loss.
>
> Legal proceedings for recovery of any loss under this policy shall not be brought after the expiration of two years. If any limitation embodied herein is prohibited by any law controlling the construction thereof such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by law.

(*See* Courier Risks Policy, Ex. C to Am. Compl. ¶ 26.) Defendant argues that because it is undisputed that the CEO of NECD and IMS knew of the loss as early as 2006, and this action did not commence until 2012, the suit is untimely as outside the policy's two–year suit–limitation clause. While, Plaintiff does not contest that such a clause may be valid under Connecticut law, *see Craig v. Colonial Penn. Life Ins. Co.*, 335 F. Supp. 2d 296, 302 (D. Conn. 2004) ("The Connecticut Supreme Court has long held that a contractual condition in an insurance policy requiring an action to be brought with a particular time period is a part of the contract and is valid and binding upon the parties." (internal quotations and citations omitted), it argues that the clause is ambiguous because it is unclear whether the two–year limitation commences from the time the loss accrues, or from the time that notice is provided to Defendants, and that the time bar issue cannot be decided without the benefit of potential additional extrinsic evidence to assist in construction of the ambiguity.[5] The suit–limitation clause does not specifically state

---

[5] Plaintiff argues that even if the Court concluded that the clause was unambiguous, the suit would not be time–barred because Plaintiff commenced this action within two years of its notifying Defendants of the loss, and within two years of the accrual of the loss. Plaintiff assumes that the loss could not have accrued before Plaintiff requested and was denied an accounting of its funds from NECD in 2010. At oral argument, counsel for Defendants argued that the loss accrued when NECD first had knowledge of the scheme to defraud, but Plaintiff claims that attributing knowledge of NECD's malfeasance to Plaintiff, an innocent third–party, would be unconscionable. Because the Court finds the terms of the suit–limitation clause ambiguous, it cannot decide timeliness on a motion to dismiss.

what event would trigger the "expiration of two years," and the policy's preceding paragraph discusses both the accrual of a loss under the policy and the provision of notice to the insurer of the existence of that loss. Therefore, the suit–limitation clause could reasonably be read as requiring a two–year limitation either from the accrual of loss or from the provision of notice to the insurer, and is thus ambiguous, *see Kulikowski*, 286 Conn. at 6 ("[A]n insurance policy is ambiguous when it is reasonably susceptible to more than one reading." (internal quotations and citations omitted)), and a more fully developed record is necessary to construe this provision.

D.    Known Loss Doctrine

Defendants argue that the "known loss" or "loss–in–progress" doctrine applies to this case. While Connecticut appellate courts have not addressed this doctrine, the District Court and a Connecticut trial court narrowed its construction to circumstances "where the insured was aware of actual losses, not potential losses prior to purchasing the policy."[6] *See, e.g.*, *Nationwide Property & Cas. Ins. Co. v. Greater New York Mut. Ins. Co.*, No. CV065002440, 2009 WL 3087247, at *6 (Conn. Super. Ct. Aug. 10, 2009) ("Insurance coverage would be precluded for damage deliberately done before the inception of insurance, or for damage that has been fraudulently concealed from the

---

Plaintiff's additional argument, that if the clause is found to be unambiguous and Plaintiff's suit is untimely, the policy time limitation should be tolled, lacks merit because tolling doctrines are inapplicable to contractual suit–limitation provisions unless the contract provides for tolling of the limitation period, which the Courier Risks Policy does not. *See Air Brake Systems, Inc. v. TUV Rhineland of N. Am., Inc.*, 699 F. Supp. 2d 462, 474 (D. Conn. 2010) ("[P]eriods of limitation that the parties create by *contract* are not susceptible to statutes and doctrines that toll the relevant period of limitation that arises by *statute.*" (emphasis in original)).

[6] Despite Plaintiff's claims that it would be "unconscionable" to apply this doctrine against an innocent third–party beneficiary, under Connecticut law, a loss payee has no greater rights than the insured under an insurance policy, and is subject to the same defenses as the insured. *See Pavano*, 139 Conn. at 649 ("Although the plaintiff had the right to sue the insurer on the contract, his substantive rights were no better than those acquired under the policy by the [insured]. Any defenses good against [the insured] are good against the plaintiff.") Therefore, if NECD and IMS are subject to the known loss doctrine, so is Plaintiff.

14

insurer prior to the purchase of the insurance policy." (internal quotations and citations omitted)); *Peck v. Public Serv. Mut. Ins. Co.*, 363 F. Supp. 2d 137, 145 (D. Conn. 2005). Thus, in *Peck*, this Court determined that the known loss doctrine did not bar coverage although the insured was a named defendant before it was added as an additional insured on a policy that would have covered the damages awarded in that suit, because the insured's liability, if any, had not yet been determined. *Peck*, 363 F. Supp. 2d at 147 ("While South Norwalk had already been named as a defendant in Peck's state suit at the time it was added as an additional insured to the Public Service policy, and thus knew that it was exposed to liability for Peck's injuries, at the time the policy commenced South Norwalk had not yet been found liable, nor had the amount of damages been established. South Norwalk was thus aware of potential *likely* losses, but not actual losses. This distinction is significant, particularly as South Norwalk was one of three defendants named in Peck's suit with potential liability and Peck's injury was of an ongoing, recurring nature."). Thus, absent an undisputed, discrete loss occurring before insurance incepts, the application of the known loss doctrine will depend on when an ongoing loss occurred such that it was an "actual" loss and the extent of the insured's knowledge of that loss. *Compare Peck*, 363 F. Supp. 2d 137, *with Travelers Property Cas. v. H.A.R.T., Inc.*, No. CV980485730S, 2001 WL 649616, at *6–7 (Conn. Super. Ct. May 18, 2001) (holding that where an insured made misrepresentations and concealed the existence of a fatal automobile accident in an attempt to reinstate a cancelled policy, the loss was uninsurable as a known loss). In this case, it is uncertain from the record who at NECD and IMS knew what about the scheme to defraud and when they knew it. For example, Mr. Sarlo's plea transcript does not specify when the scheme to defraud began, when Mr. Sarlo first had knowledge of this scheme, and what the extent of Mr. Sarlo's

knowledge was as to whether actual losses, rather than the potential for loss, had occurred. (*See* Ex. 1 to Defs.' Mot. to Dismiss). Therefore, a motion to dismiss is an inappropriate vehicle for this extremely fact–specific inquiry.

    E.    Promissory Estoppel[7]

Defendants argue that Count Three should be dismissed because Connecticut does not recognize promissory estoppel as an affirmative cause of action. While the Connecticut Appellate Court has recognized that "estoppel is generally not considered a cause of action," *Covey v. Comen*, 46 Conn. App. 46, 48 (1997); *see also Allstate Ins. Co. v. Jean–Pierre*, No. 3:10-cv-506(VLB), 2011 WL 3837085, at *5–6 (D. Conn. Aug, 30, 2011) ("Under Connecticut law, waiver and estoppel are properly plead [sic] as special defenses, not affirmative claims."), where promissory estoppel, as distinguished from equitable estoppel, was claimed, the Connecticut Supreme Court recognized it as an affirmative cause of action, *see D'Ulisse–Cupo v. Bd. of Directors of Notre Dame High School*, 202 Conn. 206 (1987). In contrast, where the promissory estoppel–equitable estoppel distinction is not made, affirmative claims have failed. *See, e.g.*, *Summerhill*, No. CV106002388S, 2012 WL 1004298, at *4–5 (Conn. Super. Ct. Mar. 5, 2012) ("Since, in this complaint, the plaintiff simply incorporates by reference allegations from a count entitled 'Breach of Contract' into a count entitled 'Equitable Estoppel' but nowhere indicates a distinct cause of action for promissory estoppel, count seven is legally insufficient."); *Allstate Ins. Co. v. Jean–Pierre*, 2011 WL 3837085, at *5–6 (dismissing affirmative cause of action for "estoppel" where no distinction was made between promissory and equitable estoppel).

---

[7] At oral argument, counsel for Plaintiff withdrew Count Four of the Amended Complaint, which alleged equitable estoppel. Thus, the Court only addresses Defendants' arguments related to promissory estoppel.

Alternatively, Defendants, misconstruing Plaintiff's promissory estoppel claim, assert that even if Connecticut does recognize a cause of action for promissory estoppel, a plaintiff may not use it to expand insurance coverage beyond the express terms of the policy. *See Heyman Assocs. No. 1 v. Ins. Co. of State of Pa.*, No. 397087, 1993 WL 57740, at *9 (Conn. Super. Ct. Feb. 24, 1993) *aff'd*, 231 Conn. 756, 767 n.12 ("The courts of most jurisdictions agree that waiver and estoppel are not available to broaden the coverage of a policy so as to protect the insured against risks not included therein or expressly excluded therefrom. . . . Since the plaintiff's claim is barred by the defendants' pollution exclusion clauses, the plaintiff, as a matter of law, should not be allowed to use the remedies of waiver and estoppel to create coverage where no exists." (internal citations omitted)). However, Plaintiff does not purport to use its promissory estoppel claim to expand the policy beyond its terms or to avoid an express exclusion, only to assert that Defendants are estopped from raising any defense of fraud on the part of NECD because their agent represented to Plaintiff that Defendants had properly audited NECD before issuing the policy. Defendants' motion to dismiss is therefore denied with respect to Count Three.

F.     Failure to Join

Defendants argue that NECD and IMS, as parties to the Courier Risks Policy, are necessary parties to this suit within the meaning of Rule 19(a), and thus Plaintiff's Amended Complaint should be dismissed for failure to join them in the action, pursuant to Rule 19(b). *See McKeon v. Guardian Ins. & Annuity Co.*, No. 3:07-cv-425 (WWE), 2007 WL 4169115, at *3 (D. Conn. Nov. 20, 2007) ("It is well established that a party to a contract which is the subject of the litigation is considered a 'necessary' party."). In the alternative, Defendants argue that the Court should order that NECD and IMS be joined in this action. Under Rule 19, a party is considered necessary to a litigation if:

17

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). In response, Plaintiff relies on *Phoenix Ins. Co.*, 169 S.E.2d at 649, in which the Georgia Court of Appeals found that the insured was not a necessary party under Georgia law (which mirrors Rule 19) because the insured had designated the plaintiff as the sole loss payee under the insurance policy under an endorsement that stated: "It is agreed that any loss payable hereunder shall be paid to the Phoenix Insurance Company," *id.* at 646–47, and under the policy "[the defendant's] liability [would be] discharged when payment [was] made to the loss payee," *id.* at 649.

In contrast, the Loss Payment Rider to the Courier Risks Policy here states: "In the event that the insured is entitled to any payment under this policy, it is agreed that the insured may designate, in writing, a customer to whom the payment or any part thereof shall be made." (Ex. D to Am. Compl.) The rider identifies Plaintiff as a "Potential Designated Customer." (*Id.*) Thus, unlike the rider at issue in *Phoenix Ins. Co.*, Defendants' potential liability to NECD under the policy may not be fully discharged by paying Plaintiff, because NECD has not explicitly designated Plaintiff as the sole loss payee, entitled to one hundred percent of any payment under the policy. Since NECD and IMS may still have claims under the Courier Risks Policy, they are necessary parties to this action because without them Defendants may be subject to the risk of incurring inconsistent obligations under the policy. However, because joinder is feasible in that NECD and IMS are subject to service of process and joinder would not result in a loss of complete diversity, the Court need not consider whether they are indispensable parties

18

under Rule 19(b). *See McKeon*, 2007 WL 4169115, at *3 ("There is no evidence that McKeon is not subject to service of process or that his joinder would deprive the court of jurisdiction. It is not necessary to continue the analysis as to McKeon's status as an 'indispensable' party because joinder is feasible.") Thus, Defendants' motion to dismiss pursuant to Rule 12(b)(7) is denied, but the Court directs that NECD and IMS be joined in this action.

      G.      Failure to State a Claim

Defendants' motion claiming that Plaintiff fails to state a claim upon which relief can be granted merely reiterates its argument that Plaintiff lacks standing or is not a third–party beneficiary under the Courier Risks Policy. However, as discussed above (*see supra* Part II.B), under Connecticut law, Plaintiff has pled sufficient facts to allege that it is a third–party beneficiary to the policy and Defendants' motion to dismiss on this basis is denied.

III.      Conclusion

For the foregoing reasons, Defendants' Motion [Doc. # 25] to Dismiss is DENIED. Plaintiff is directed to join NECD and IMS in this action.

                            IT IS SO ORDERED.

                            /s/
                            Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 20th day of March, 2013.