# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KNOWN LITIGATION HOLDINGS, LLC (AS SUCCESSOR ASSIGNEE OF DOMESTIC BANK), )<br><br>Plaintiff, )<br><br>vs. )<br><br>NAVIGATORS INSURANCE COMPANY, )<br>NAVIGATORS MANAGEMENT (UK) LTD, )<br>CERTAIN INTERESTED UNDERWRITERS AT )<br>LLOYD'S OF LONDON, NEW ENGLAND CASH )<br>DISPENSING SYSTEMS, INC., AND )<br>INTEGRATED MERCHANT SYSTEMS, LLC, )<br><br>Defendants. ) | **CIVIL ACTION NO.:**<br>**3:12-CV-00269 (JBA)**<br><br>January 27, 2016 |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## <u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff, Known Litigation Holdings, LLC, as successor assignee of Domestic Bank, submits this memorandum of law in support of its partial motion for summary judgment. For the reasons set forth below, this Court should grant KLH's partial motion for summary judgment and declare that Navigators is obligated under the 2010 insurance policy to remit the insurance proceeds that are now due to KLH and find that, as a matter of law, Navigators breached the 2010 insurance policy.

**INTRODUCTION**

This case is based on Navigators' illegal rescission of a courier risk insurance policy that included coverage for armored vehicle transit, premises risks, and vault/premises risks. The policy was issued by Navigators, obtained by NECD/IMS, and named Domestic Bank as the loss payee. The purpose of the policy was to protect Domestic Bank if NECD/IMS were unable to account for or fully repay Domestic Bank's ATM cash pursuant to a courier agreement between the parties. KLH is the successor assignee of the policy and is the only party entitled to recover under the terms of the policy.

Domestic Bank was a southern New England regional bank with a large network of ATMs located primarily in stores throughout the region. Starting in 2000, NECD and its affiliate, IMS provided a variety of "ATM Services" to assist Domestic Bank, its only customer, in managing and operating its ATM network.

In May 2006, Domestic Bank entered into a Courier Agreement with NECD and IMS. Under this agreement, NECD was responsible to pick up cash Domestic Bank vaulted with Mount Vernon Money Center, deliver this cash to ATMs, refill the ATMs' canisters, and remove the residual cash remaining in the ATMs for ultimate return or credit to Domestic Bank. To provide protection in case of currency shortages, embezzlement, or theft, the Courier Agreement required NECD to maintain insurance naming Domestic Bank as loss payee.

Accordingly, NECD obtained a courier risk insurance policy from Navigators that named Domestic Bank as loss payee. In July 2006, NECD broadened its insurance to include armored vehicle transit, premises risks, and vault/premises risks. This coverage was renewed each year through 2010.

2

3688591v.6

In February 2010, Domestic Bank became aware of government investigations into money allegedly stolen from its vaulting company, Mount Vernon.  After learning of these allegations against Mount Vernon, Domestic Bank asked NECD for an accounting of all bank cash in its ATM network.  However, on February 23, 2010, Domestic Bank learned for the first time that a proper accounting could not be done.  In fact, Domestic Bank was advised that there was a shortage of at least $1 million in Domestic Bank's cash being held by NECD.  Shortly thereafter, Domestic Bank though its own investigation learned that this shortage was over $5 million.

Domestic Bank thought it had protection through Navigators.  However, after just issuing a reservation of rights, Navigators in November 2010 issued a notice rescinding all policies issued to NECD with Domestic Bank as loss payee from their inception.

As a result KLH commenced this lawsuit.  KLH seeks: (1) a declaration that Navigators is obligated under the policies to remit the insurance proceeds that are now due to KLH; (2) breach of contract; and (3) a promissory estoppel claim based off the communications from Navigators' agents' communications concerning the policy.

KLH here is now only seeking partial summary judgment.  Through this summary judgment motion, KLH is seeking a declaration that Navigators is obligated to remit the insurance policies under the 2010 insurance policy and a finding that Navigators breached the 2010 policy.  As explained below, under the 2010 policy, a loss only occurs when Domestic Bank demands its ATM Cash returned pursuant to the Courier Agreement.  It is undisputed that this occurred in 2010 and Domestic Bank did not know about the embezzlement loss before this time.  Accordingly, the loss should be covered under the relevant policy. If the Court agrees with

this interpretation, KLH then requests a hearing to determine the amount of damages owed to KLH.[1]

For the reasons set forth below, and in the accompanying papers, this Court should grant KLH's motion for partial summary judgment.

## STATEMENT OF FACTS

### A.    The NECD And IMS Agreements

Domestic Bank was a southern New England community bank with a network of over 1,200 automatic teller machines located primarily in stores throughout the region.  (Declaration of Craig Baker ("Baker Dec."), ¶ 6.)  Starting in 2000, NECD and its affiliate, IMS, provided a variety of "ATM Services" to assist Domestic Bank, its only customer, in managing and operating its ATM network.  (Declaration of Roy W. Breitenbach ("Breitenbach Dec."), Exh. 1. Pursuant to the agreement, NECD was responsible for providing certain ATM services for Domestic Bank with respect to ATMs owned by Domestic Bank.  (Breitenbach Dec. Exh. 1.)

Expanding the relationship, on May 12, 2006, Domestic Bank entered into a separate "Agreement Re Courier Services" with NECD and IMS.   (The "Courier Agreement") (Breitenbach Dec. Exh. 2.)  As part of their provision of services under the Courier Agreement, NECD was in certain instances to pick up cash owned by Domestic Bank and supplied to NECD (the "Bank Cash") from non-party Mount Vernon, an armored car and cash management service. (Breitenbach Dec. Exh. 2 at ¶ 1.)  Under the Courier Agreement, NECD undertook to obtain and

---

[1]      KLH also has a promissory estoppel cause of action, which it is not moving for summary judgment on.

transfer Bank Cash to ATMs, fill existing canisters of Bank Cash, and count residual cash.  (*Id.*)
IMS was to provide accounting and reporting services.  (*Id.*)

Pursuant to the Courier Agreement, while providing services to Domestic Bank, NECD
and IMS were required to maintain insurance.  (Breitenbach Dec. Exh. 2 at ¶ 2.)  Specifically,
Paragraph 2 of the Courier Agreement required NECD/IMS to maintain insurance and "[i]n all
such insurance, Bank will be named as loss payee."  (*Id.*)  Further, the Courier Agreement was
required to contain a provision holding NECD and IMS "responsible for any shortage or loss of
Bank's currency, resulting from embezzlement or theft by any third party or employee or agent
of [NECD or IMS]."  (*Id.*)

In compliance with the Courier Agreement, NECD/IMS procured such insurance with
Navigators naming Domestic Bank "loss payee" and protecting Domestic Bank for any theft or
embezzlement on the part of any NECD/IMS employees or agents.  (Baker Dec. ¶ 12.)  These
provisions were vital to Domestic Bank.  (Baker Dec. ¶ 17.)  They provided protection against
losses, including losses attributable to embezzlement or theft of any employee or agent of NECD
or IMS.  Furthermore, in reliance on these provisions, Domestic Bank did not obtain additional
insurance coverage.  (Baker Dec. ¶ 17.)

**B.**     **The Insurance Policies**

In accordance with Courier Agreement, NECD/IMS sought insurance for the Bank Cash
naming KLH as a loss payee. In February 2006 Navigators insured NECD for certain "courier
risks" for a one year term.  (Breitenbach Dec. Exh. 3.)  The policy provided both premises
coverage and transit coverage.  (*Id.*)  Insuring Clause I – Premises Coverage provides:

5

1.     Insurers shall be liable to the Insured **for the Insured's *liability to others*** as the result of loss or damage to property, while such Property is on the Premises or any Banking Premises.

(emphasis added).  Similarly, Insurance Clause II – Transit Coverage provides:

2.     Insurers shall be liable to the Insured **for the Insured's *liability to others*** as the result of loss or damage to Property, while such Property is (1) in transit to, from or within any conveyance owned, operated or contracted for by the Insured under bills of lading or shipping receipts issued by the Insured, or (2) in a night depository chute or safe maintained by any bank or trust company.

(emphasis added).  (Breitenbach Dec. Exh. 3.)

Additionally, this Policy provided protection to Domestic Bank for losses caused by dishonesty and/or embezzlement committed by the employees of the insured.  (Breitenbach Dec. Exh. 3.)

This policy was later amended to also contain a "Loss Payment Rider" and a 30 Days Cancellation Clause.  (Breitenbach Dec. Exhs 4 & 5.)  The Loss Payment Rider provided that:

In the event that the insured is entitled to any payment under this policy, it is agreed that the insured may designate, in writing, a customer to whom the payment or any part thereof shall be made. It is further understood and agreed that insured's designee has no rights under the contract of insurance. ***The only right conferred is the right to receive direct payment in accordance with this rider*** but in no event shall payments made under this policy exceed the applicable coverage limits.  The inclusion of more than one designated customer shall not increase the limits of the insurer's liability.

Potential Designated Customer(s):-

Domestic Bank
815 Reservoir Avenue,

6

Cranston, RI 02910
Attn: Craig Baker

(Breitenbach Dec. Exh. 4.) (emphasis added).

Next, on July 10, 2006 an Armored Car Cargo Liability Policy endorsement was included as part of the insurance policy.  (Breitenbach Dec. Exh. 6.)  The Armored Car Cargo Liability Policy endorsement provided coverage for loss of or damage to property, "including any act or omission of the insured or any of its employees, or anyone acting in its service." (*Id*.)

Domestic Bank was very involved in the negotiation of the policy.  On numerous instances, Domestic Bank sought specific clarification concerning NECD's coverage under the policy.  Normally, Domestic Bank's counsel would communicate with Marshall Sterling Insurance ("Marshall Sterling"), the overseas broker for Navigators.  Domestic Bank even negotiated part of the policy with Marshall & Sterling.

From 2006 through and including 2010, Navigators continued to insure NECD and IMS for "Armored Car Transit Risks," "Vault/Premises Risks," and "Unarmored Vehicle Transit Risks" all of which contained the same "loss payee" provision, 30 day cancellation provision, and a provision protecting Domestic Bank from acts of dishonesty and/or embezzlement committed by any employees or agents of NECD/IMS.  (Breitenbach Dec. Exhs. 7 & 8.)

The future policies had similar language.  For example, the 2010 policy stated, "The policy covers the liability of the insured, assumed by the contractor or otherwise, for loss of or damage to the property."  (Breitenbach Dec. Exh 8, ¶ 1.)  Further, the 2010 policy had an extremely broad definition of "property,"  which included "money."  (Breitenbach Dec. Exh 8, ¶ 2.)  In other words, since, in 2010 Domestic Bank was NECD's only client, the 2010 policy

7

singularly protected Domestic Bank from NECD's inability to reimburse Domestic for any lost cash pursuant to the Courier Risks Agreement.  (Breitenbach Dec. Exh. 8.)

## C.      NECD/IMS's Employees Embezzle Bank Cash

Starting around 2007, some of NECD/IMS's employees, unbeknownst to Domestic Bank or Navigators, began diverting Domestic Bank cash intended to refill ATMs to themselves for their personal use.  (*Id.*)  To conceal their wrongful actions, these NECD/IMS employees took cash designated for one ATM and used it in another ATM that was short of cash in order to avoid detection. (*Id.*)  This scheme apparently continued through February 2010.  (*Id.*)

On February 9, 2010, Domestic Bank learned that its vaulting company, Mount Vernon, was the subject of federal government investigations into currency theft and bank fraud.  (Baker Dec. ¶ 20.)   Upon learning this, Domestic Bank asked NECD to undertake an immediate accounting of Bank Cash.  (Baker Dec. ¶ 20.)

On February 23, 2010 NECD/IMS CEO Joe Sarlo met with Domestic Bank Executive Vice President Craig Baker in Mystic, Connecticut. During that meeting, Joe Sarlo told Craig Baker that there was a shortage of Bank Cash of at least $1 million.  (Baker Dec. ¶ 21.)

Domestic Bank immediately commenced its own investigation and audit of ATMs serviced by NECD to determine with certainty if there were actual shortages of Bank Cash. (Baker Dec. ¶ 22.)  Subsequent to the February 23, 2010 meeting, Domestic Bank determined that there were shortages of Bank Cash of $ 5,353,761.  (Baker Dec. ¶ 23.)  (Breitenbach Dec. Exh. 9.)

**D.     Domestic Bank Demands**
       **The Bank Cash Be Returned And**
       <u>**Attempts To Collect On The Insurance Policies**</u>

Following its investigation, on March 31, 2010, in accordance with the Courier Agreement, Domestic Bank made a written demand upon NECD and IMS for immediate reimbursement of the shortages that it had discovered.  (Breitenbach Dec. Exh. 9.)  NECD and IMS failed to account for the missing money and have failed to return the Bank Cash or otherwise make restitution for the losses.  (Baker Dec. ¶ 24.)  This demand was also served on Marshall Sterling, an agent of Navigators and Specialty Broking Services.  (Baker Dec. ¶ 24.)  Through this demand letter, Navigators was made aware of any fraud or shortages of the Bank Cash.  (*Id.*)

In the demand letter, Domestic Bank stated that it was seeking to recover based on the Courier Agreement and the policies issued to NECD/IMS for Domestic Bank's protection and benefit.  (Breitenbach Dec. Exh. 9.)  Particularly, Domestic Bank demanded recovery based on the "Loss Payment Rider" and the provisions within the policies protecting Domestic Bank for losses caused by dishonesty or embezzlement committed by the employees of the insured.  (*Id.*)  This letter triggered reimbursement under the Courier Agreement and, thus, a "liability" which is what the policies insure.  (Breitenbach Dec. Exh. 9.)

In addition to the provisions under the policies, Domestic Bank's demand was also made in reliance of additional assurances regarding coverage made by Navigators and its agents.  (Breitenbach Dec. ¶ 9.)

E.      **Navigators Declared The Policies Void *Ab Initio***

On August 31, 2010, Lowers & Associates, purportedly on behalf of Navigators, issued a Reservations of Rights letter regarding Domestic Bank's claim.  (Breitenbach Dec. Exh. 10.)

Next, on November 29, 2010, Lowers & Associates, on behalf of Navigators, issued a Notice of Rescission and Disclaimer of Coverage letter.  (Breitenbach Dec. Exh. 11.)  Lowers & Associates stated that Navigators was rescinding the policies issued to NECD and IMS *ab initio* and that there would be no coverage and "[a]ll premiums paid to [Navigators] shall be returned… to NECD."  (*Id.*)  Navigators, declared the policies *void ab initio* on account of "material misrepresentations" made by NECD/IMS on its applications for insurance.  (Breitenbach Dec. Exh. 11.)  Furthermore, Navigators, claimed that there is nonetheless no coverage because of certain conditions and exclusions to coverage and issued a Reservations of Rights letter regarding Domestic Bank's claim.  (*Id.*)

F.      **Procedural History**

In response to Navigators' rescission KLH began this action.  KLH, as the successor assignee of Domestic Bank, filed an Amended Complaint on May, 22 2012 in order to recover on the insurance policies Navigators had with IMS and NECD.  (Doc. 24.) KLH sought (1) a declaratory judgment that Navigators is obligated to remit the insurance proceeds pursuant to the insurance agreements; (2) damages for Navigators breach of the insurance agreements; (3) to have Navigators be estopped from denying coverage to KLH because of promises made by Navigators which Domestic Bank relied on.  KLH's allegations are not only based on KLH's role as a loss payee under the insurance policy, but as a direct payee to whom Navigators owed direct obligations separate and apart from IMS and NECD since the insurance policies were

10

obtained for the benefit of Domestic Bank.  KLH is only seeking summary judgment for the first

two causes of action pursuant to the 2010 insurance policy.  KLH will seek to prove the reliance,

direct obligation, and breaches of the previous insurance agreements at trial.

Navigators filed a motion to dismiss in June of 2012 (Doc No. 25 & 26.)  Navigators'

motion was denied.  (Doc. 34.)  The Court found that: (1) KLH had standing "Because the terms

of the Loss Payment Rider clearly stated that a designated loss payee has a right to direct

payment from Defendants" and "has standing to pursue this suit directly against Defendants."

(Doc. 34 at p. 12.); (2) the suit limitation clause is ambiguous; (3) the known loss doctrine cannot

dismiss the case because it is a very fact specific inquiry and "In this case, it is uncertain from

the record who at NECD and IMS knew what about the scheme to defraud and when they knew

it.  For example, Mr. Sarlo's plea transcript does not specify when the scheme to defraud began,

when Mr. Sarlo first had knowledge of this scheme, and what the extent of Mr. Sarlo's

knowledge was as to whether actual losses, rather than the potential for loss, had occurred."

(Doc. 34 at p. 15-16.); and (4) KLH's promissory estoppel was a valid claim to withstand the

dismissal motion.  The Court, however, did order that KLH add IMS and NECD to the action as

necessary parties.

Accordingly, on September 5, 2013, KLH filed its Second Amended Complaint naming

IMS and NECD as nominal defendants in the action.   (Doc. 47.) The Second Amended

Complaint was served directly on NECD and IMS and their trustees.  Navigators answered the

Second Amended Complaint and filed cross claims against IMS and NECD for insurance fraud,

indemnification, and for a declaratory judgment finding the insurance policies at issue were

properly rescinded.  (Doc 51.)  On March 10, 2014, Navigators moved for a default judgment

against NECD and IMS.  (Doc. Nos. 72 & 73).  In its motion for a default judgment against

NECD and IMS, Navigators sought a declaration that Navigators properly rescinded the insurance policies and properly denied coverage.

The Court denied Navigators' motion for a default judgment against NECD/IMS.  The Court held that:

> Granting [Navigators'] requested relief, and declaring that the underlying action is not covered, would, in effect, ***decide the case before… the non-*defaulting [Cross-Claim Intervener] Defendant had an opportunity to be heard**.  Id.*  For all of these reasons, equity requires that the entry of default against NECD and IMS remain but that judgment on Navigators' cross-claims not enter at this time.

Doc 99 at p. 5. (Emphasis added).

In other words, the Court determined that it would be inappropriate to enter a default before **KLH's claims** were heard.  (Doc. 99 at p. 3 "As other Courts have recognized, entry of default judgment in an action for declaratory relief where, as here, a non-defaulting party's interest are intertwined with those of the defaulting party, ***would prevent the non-defaulting party from litigating its claims*** and thus cause great prejudice to that party.")

Navigators filed a renewed default judgment motion on October 19, 2016. (Doc No. 123.) The Court has yet to rule on that motion.[2]

---

[2] Due to the Court's prior rulings and the case law cited in KLH's opposition (Doc No. 131.), it would in inappropriate to grant the default before this case is decided on the merits via summary judgment or at trial.

## ARGUMENT

### A.    Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of establishing that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (citation omitted).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  *Anderson*, 477 U.S. at 255; *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985) (citations omitted), *cert. denied*, 484 U.S. 918 (1987).  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).  Consistent with this standard, all evidence favorable to the non-moving party must be credited if a reasonable jury could credit it, while evidence favorable to the moving party must be disregarded, unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact" Anderson*, 477 U.S. at 247-48.

In insurance cases, summary judgment may be granted as to the extent of coverage as a matter of law. *Jurris v. Maccabees Mut. Life Ins. Co.*, 587 F. Supp. 1301, 1305 (D. Conn. 1984); see also *American Home Assur. Co. v. Abrams*, 69 F. Supp. 2d 339, 348 (D. Conn. 1999) ("interpretation of the language in an insurance contract is a matter of law to be decided by the Court").   Therefore, in an insurance case, "[i]t is the function of the court to construe the provisions of the insurance contract and, if no material facts are at issue, the question of whether coverage exists is a question of law that is appropriately decided on a motion for summary judgment." *Peerless Ins. Co. v. Disla*, 999 F. Supp. 261, 263 (D. Conn. 1998); *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 445 (D. Conn. 2010).

## B.      Legal Standard Regarding Judicial Interpretation of Insurance Policy Language

It is undisputed that Connecticut law applies to this case.  Accordingly, interpretation and proper construction of an insurance policy are to be determined by the Court as a matter of law. *Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 805 (Conn. 1999); *Thompson & Peck, Inc. v. Harbor Marine Contracting Corp.*, 203 Conn. 123, 131 (1987).  When examining a contract of insurance, the Court must view the contract in its entirety.  *Community Action for Greater Middlesex County, Inc. v. American Alliance Insurance, Co.*, 254 Conn. 387, 399 (2000).  Each contract provision must be read in light of other provisions and every provision must be given effect if it is possible to do so.   (Internal quotation marks omitted.) *United Illuminating Co. v. Wisvest-Connecticut, LLC.*, 259 Conn. 665, 671 (2002).  "The individual clauses of a contract cannot be construed by taking them out of context and giving them an

interpretation apart from the contract of which they a part." *Frantz v. Romaine*, 93 Conn.App. 385, 395, *cert. denied*, 277 Conn. 932 (2006).  The provisions of a contract cannot be construed in a vacuum.  *Community Action*, 254 Conn. at 399.  Rather, the intent of the parties is to be derived from the four corners of the policy. *Id.*

Connecticut has established that any ambiguity in the terms of an insurance policy must be strictly construed in favor of the insured and coverage because the insurance company drafted the policy.  *Community Action*, 254 Conn. at 399.  A contract is ambiguous if the intent of the parties is not clear from the language of the contract itself.  *United Illuminating*, 259 Conn. at 670-671.   A contract is also ambiguous if it is susceptible to more than one reasonable interpretation.   *Id.* at 671.   "When words of an insurance contract are, without violence, susceptible of two interpretations, that which will sustain the claim and over the loss must, in preference, be adopted." *Raffel v. Travelers Indemnity Co.*, 141 Conn. 389,392 (1954).  In other words, "[i]f an exclusionary provision is ambiguous so that an average policyholder of ordinary intelligence can reasonably read the policy as both favoring and disallowing coverage, we construe the clause in a manner most beneficial to the insured, i.e., in favor of coverage and against the insurer." *Bishop*, 344 F.3d 305, 307 (2d Cir. 2003).

**C.     Since There Was No Loss Under The Policy Until 2010,
        <u>KLH Is Entitled To Payment Under The Insurance Policy</u>**

As explained above, the insurance policies were renewed yearly between 2006 and 2010. Since under the insurance policies, a loss did not occur until Domestic Bank demanded back its Bank Cash or NECD could not reimburse the money under the Courier Agreement, there was no loss until March 31, 2010 when the Bank's representative wrote to NECD and said:

> Such reimbursement is to be made forthwith upon notice by Bank of such shortage or loss.  This letter is formal notice on behalf of the Bank that a very substantial shortage or loss has occurred.

(Breitenbach Dec. Exh. 9.)

The 2010 Insurance Policy states that **"[t]his policy covers the liability of the insured, *assumed by the contract or otherwise*, for loss of or damage to property, as defined in clause 2."** (Breitenbach Dec. Exh 8 ¶ 1.)  Clause 2 defines property as including "money."  (Breitenbach Dec. Exh 8 ¶ 2.)  Domestic Bank was NECD/IMS' only client and the only party it would owe pursuant to a loss of property.  (Baker Dec. ¶ 10.)  Therefore, the liability that the 2010 policy intended to cover was the Courier Agreement.

Accordingly, the March 31, 2010 letter triggered reimbursement under the Courier Agreement and fell under the 2010 insurance policy.  (Breitenbach Dec. Exh. 9.)  Again, NECD/IMS's obligation to Domestic Bank under the Courier Agreement was to provide Domestic Bank with full repayment of Domestic Bank's bank cash which NECD/IMS held.  (Breitenbach Dec. Exh. 2 ¶ 3 "Such reimbursement shall be made forthwith upon notice by Bank to Couriers of any such shortage or loss.").  Failure or inability of NECD/IMS to comply with this obligation was what the insurance policies insured against and is a loss under the policy.  Similarly, the recession was not appropriate since a loss had never occurred and any fraudulent acts were done by NECD employees.

Therefore, on March 31, 2010, when Domestic Bank sent notice to Marshall Sterling and Specialty Broking Services, coverage under the 2010 insurance policy was triggered.

1.      KLH Is Entitled To A Declaration That
        Navigators Is Obligated Under The Policies
        <u>To Remit Insurance Proceeds That Are Now Due KLH</u>

Accordingly, this Court should render a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201.  KLH is entitled, as a matter of law, to a declaration that Navigators is obligated under the 2010 policy to remit insurance proceeds that are now due KLH. An actual controversy presently exists between Domestic Bank and Navigators concerning the proper construction of the policies, the enforceability of the purported rescission, and the rights and obligations of the parties thereto with respect to Navigators' contractual duty to reimburse Domestic Bank for losses of money that had been in NECD's and IMS's custody.  Therefore**,** there is an actual "case of actual controversy within its jurisdiction" for which a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.  Moreover, Connecticut law has made clear that "[t]here is no question that a declaratory judgment action is a suitable vehicle to test the rights and liabilities under an insurance policy." *St. Paul Fire & Marine Ins. Co. v. Shernow*, 22 Conn. App. 377, 380, 577 A.2d 1093 (1990).

Accordingly, since KLH made a demand for its Bank Cash pursuant to the Courier Agreement, it is entitled to payment under the 2010 Insurance Policy and respectfully requests an inquest to determine the amount owed under the Policy.

2.      <u>KLH Is Entitled To A Breach Of Contract As A Matter Of Law</u>

KLH is also entitled to be granted judgment on its breach of contract claims as to the 2010 policy.  "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Whitaker*

*v. Taylor*, 99 Conn.App. 719, 728, 916 A.2d 834 (Conn. App. Ct. 2007).  It is undisputed that there was an agreement formed between Navigators and NECD/IMS, to which Domestic Bank was the designated third party beneficiary.  (Breitenbach Dec. Exh. 8.) Navigators insured NECD/IMS for certain property losses under the policies, and Domestic Bank was the designated customer to be paid in the event of a loss under the loss payment riders attached to, and made a part of, the policies.  (*Id.*)  NECD and IMS performed under the 2010 policy, in that NECD and IMS paid the premiums due to Navigators.  Finally, as KLH established above, Navigators breached the agreement by failing to pay Domestic Bank for the losses it incurred as a loss payee under the 2010 policy when it demanded the ATM cash back via the March 31, 2010 letter.

Accordingly, KLH requests a hearing to determine the amount owed under the 2010 policy.

## CONCLUSION

For the foregoing reasons, Plaintiff KLH respectfully requests that this Court grant KLH's Motion for Summary Judgments under Fed. R. Civ. P. 56. In the alternative, KLH requests that Navigators' motion for a default judgment be denied.

Dated: Stamford, Connecticut
    January 27, 2016

PLAINTIFF,
KNOWN LITIGATION HOLDINGS, LLC

By:   */s/ Roy W. Breitenbach*
     Roy W. Breitenbach [ct 28949]
     Michael J. Keane, Jr. [ct29455]
GARFUNKEL WILD, P.C.
350 Bedford Street, Suite 406A
Stamford, Connecticut 06901
Phone: (203) 316-0483
Fax: (203) 316-0493
*rbreitenbach@garfunkelwild.com*

## **CERTIFICATION**

This is to certify that on the 27th day of January, 2016, a copy of the foregoing was emailed to the following:

Jeffrey F. Gostyla, Esq.
Halloran & Sage LLP
One Goodwin Square
225 Asylum Street
Hartford, CT  06103
*gostyla@halloran-sage.com*

Michael A. Bono Esq.
Wade Clark Mulcahy
111 Broadway
New York, NY 10006
*mbono@wcmlaw.com*

                    */s/Roy W. Breitenbach*
                    Roy W. Breitenbach

19